NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>PANIOLO CABLE COMPANY, LLC,<br>     Debtor. | BAP Nos.   HI-24-1066-CSG<br>               HI-24-1095-CSG<br>               (Related Appeals) |
| CLEARCOM, INC.,<br>          Appellant,<br>v.<br>DAVID C. FARMER, Plan Agent,<br>Successor-in-interest to Michael<br>Katzenstein,<br>         Appellee. | Bk. No. 18-01319-RJF<br><br>Adv. No. 21-90004-RJF<br><br>**MEMORANDUM***  |

Appeal from the United States Bankruptcy Court
for the District of Hawaii
Robert J. Faris, Chief Bankruptcy Judge, Presiding

Before: CORBIT, SPRAKER, and GAN, Bankruptcy Judges.

## INTRODUCTION

Appellant Clearcom Inc. ("Clearcom"), an affiliate of the chapter 11[1]

---

\* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

debtor Paniolo Cable Company, LLC ("Paniolo"), appeals the bankruptcy court's order granting the trustee summary judgment on his claims against Clearcom for breach of contract and unjust enrichment. The trustee alleged that Clearcom wrongfully received payments for its continued subletting of estate assets without authority or permission and in direct contradiction of Clearcom's specific representations and warranties. Because there were no genuine issues of material fact, the bankruptcy court did not commit error in granting summary judgment. Clearcom also appeals the bankruptcy court's denial of its motion for relief from the final judgment. Because Clearcom failed to establish it was entitled to the requested relief, the bankruptcy court did not abuse its discretion in denying Clearcom's motion. We AFFIRM.

## FACTS[2]

This case is merely one offshoot of litigation that has spanned years concerning several entities and persons involved in providing telecommunication services to consumers living on Hawaiian Home Lands.[3] The ongoing litigation involves millions of dollars, competing interests, is occurring in multiple courts, and often overlaps in both issues

---

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case and related cases. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[3] The Hawaiian Home Lands (sometimes referred to as "HHL") refer to approximately 200,000 acres of land across the islands of Hawai'i set aside for the benefit of native Hawaiians pursuant to the Hawaiian Homes Commission Act.

and parties. Unsurprisingly, the factual history is lengthy, but much is irrelevant to the narrow and discrete issues before the Panel and will only be recited to the extent it bears on this Panel's decision.

## A.     License Agreement No. 372

In 1995 the State of Hawai'i Department of Hawaiian Home Lands ("DHHL") issued License Agreement No. 372 ("License 372") to Waimana Enterprises, Inc. ("Waimana"), a Hawaiian corporation owned by Mr. Albert Hee ("Hee").[4]

## B.     Waimana and its affiliates

In order to build the infrastructure necessary to fulfill License 372, Hee formed several entities which were affiliates of Waimana and wholly owned and controlled by Hee.

In the mid-1990s, Hee formed Sandwich Isles Communications, Inc. ("Sandwich Isles" or "SIC"). SIC was created to be the telephone services provider under License 372. SIC owned and operated the land-based telecommunications system that connected to end-users.

In the early 2000's, Hee formed Paniolo, the involuntary debtor in the underlying chapter 11 case. Paniolo was formed as a special purpose entity to own and construct a large capacity submerged marine fiber and

---

[4] Before December 2012, Mr. Hee was the sole owner of Waimana. After December 2012, Mr. Hee owned 10% of Waimana, with the other 90% owned by Mr. Hee's family trusts. For ease of reading and because ownership remained within the Hee family, the memorandum hereafter refers to Mr. Hee and the applicable family trusts as simply "Hee."

terrestrial fiber telecommunications cable network that would connect the five principal islands of Hawaii (the "Paniolo Cable Network").

Around 2011, Hee formed Pa Makani LLC ("Pa Makani") dba Sandwich Isles Wireless to provide wireless communications services under License 372.

Around 2014, Hee formed Clearcom dba Sandwich Isles Broadband, the appellant in this case, to provide broadband services under License 372.

The cost to provide telecommunications infrastructure to the mostly rural Hawaiian Home Lands under License 372 was very high. *United States v. Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. 3d 757, 763 (D. Haw. 2019). Consequently, both SIC and Paniolo incurred enormous debt to build the necessary infrastructure. Combined, SIC and Paniolo spent about $310 million to build systems that served only about 36,500 customers. Paniolo borrowed approximately $150 million from a private entity, Deutsche Bank ("Deutsche"). SIC borrowed more than $160 million from Rural Utilities Service, an agency of the USDA.

SIC, Pa Makani, and Clearcom all sold telecommunications services to end users. Unlike those affiliates, Paniolo did not sell telecommunication services to end users. Instead, Paniolo would service its debt by leasing its cable network to, and entering into a joint use agreement with, SIC. In other words, it was planned that Paniolo would lease SIC rights to use capacity on its Paniolo Cable Network, a necessary conduit for SIC in providing telecommunications services to end users. SIC could then sublet

4

some of its capacity on the Paniolo Cable Network to other Waimana affiliates and third parties.

In 2007, Paniolo and SIC entered into two agreements that allowed them to connect SIC's terrestrial system with Paniolo's submarine system and direct traffic between their systems, a Joint Use Agreement ("JUA") and a lease (the "SIC Lease"). The SIC Lease required SIC to make quarterly lease payments to Paniolo in exchange for capacity access on the Paniolo Cable Network.

As of January 1, 2013, SIC was required to make monthly loan payments of $1,086,758.01 to the United States. *Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. 3d at 765. Because of the rural nature of the HHL, SIC could not service its massive debt solely through income from its customers. Therefore, SIC relied on large subsidies from the Federal Communication Commission ("FCC") Universal Service Fund to cover the shortfall ("USF Subsidies"). SIC received $14,000 per line per year in USF Subsidies. The USF Subsidies were crucial to both SIC and Paniolo's success because SIC's lease payments comprised Paniolo's only source of income.

In 2011 the FCC instituted a $250 per month per line cap on its USF Subsidies effective July 2014.[5] SIC applied for, but was denied, a waiver to

---

[5] *See Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. 3d at 766; *see also* 47 C.F.R. § 54.302.

continue receiving the higher subsidy rates.[6] Through the process, the FCC determined that SIC was using the subsidies on significant "wasteful expenses, totaling many millions of dollars, including significant payments to a number of affiliated and closely-related companies." *Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. 3d at 766 (citation omitted).

As a result of the reductions in subsidies, SIC reduced its debt payments to the United States and made only irregular lease payments to Paniolo. By December 2014, SIC had completely stopped paying Paniolo. Consequently, Paniolo stopped paying its debt to Deutsche.

## C.     Paniolo's involuntary chapter 11 petition.

In late 2018, successors in interest to Deutsche ("Paniolo Creditors") filed an involuntary chapter 11 petition for relief against Paniolo. The bankruptcy court appointed chapter 11 trustee Michael Katzenstein ("Trustee"). From the outset, Trustee intended to liquidate Paniolo's assets free and clear pursuant to a § 363 sale and from the beginning, Hee, Waimana and its affiliates, opposed to a sale, were recalcitrant and uncooperative.

---

[6] *In re Connect Am. Fund*, 28 FCC. Rcd. 6553, 2013 WL 1962345 (2013). Not only did the FCC deny SIC's request, it determined that SIC had used a significant amount of the previously distributed USF Subsidies improperly. The FCC entered an order requiring SIC to repay $27 million. The FCC denied reconsideration. *See In re Sandwich Isles Commc'ns, Inc.*, 34 FCC Rcd. 577, 2019 WL 105385 (2019).

6

**D.     Trustee's adversary action against SIC for lease payments**

As noted above, Paniolo leased capacity on its Paniolo Cable Network to SIC and SIC breached the lease by failing to make the quarterly rent payments to Paniolo. Accordingly, in June 2019, Trustee filed an adversary complaint against SIC seeking a judgment for the unpaid lease payments. SIC opposed the complaint on several grounds, including that Trustee could not revoke SIC's right to lease capacity on the Paniolo Cable Network.

The bankruptcy court disagreed. On December 17, 2019, the bankruptcy court granted Trustee's motion for summary judgment and entered judgment against SIC for $256,552,854 plus interest ("SIC Judgment"). The SIC Judgment was not appealed.

**1.     The U.S. Marshal Sale.**

To satisfy the SIC Judgment, the U.S. Marshal for the District of Hawaii ("Marshal") executed and levied on virtually all of SIC's real and personal property. The Marshal's Certificate of Execution identified the assets to be levied (the "SIC Levied Assets"). SIC's Levied Assets included "Scheduled A.2 Assets," a 10-page list of personal property assets. The Scheduled A.2 Assets included *inter alia* all SIC's structures, central offices, terminal buildings, equipment, fiber cables, and related information and records, and all SIC's licenses, specifically identifying License 372.

The Marshal sold SIC's Levied Assets at a public sale where Trustee was the highest bidder. The bankruptcy court approved and confirmed the Marshal's sale ("Marshal Sale Order") on March 16, 2020.

The Marshal Sale Order specifically identified Trustee as the purchaser and identified the SIC Levied Assets as the assets purchased. The Marshal Sale Order conspicuously noted that the SIC Levied Assets included all SIC's interest in License 372. The Marshal Sale Order stated that SIC's Levied Assets were sold free and clear and ordered that SIC and anyone else claiming any interest in SIC's Levied Assets were "forever barred and foreclosed of and from all right, title and interest, and claims at law or in equity" as to SIC Levied Assets.

The Marshal Sale Order was not appealed.

## 2.    Trustee's garnishment motion.

Although Trustee rather than SIC was now entitled to collect SIC receivables attributable to the SIC Levied Assets (including payments SIC was receiving for subletting capacity on the Paniolo Cable Network), Trustee was aware that SIC was still accepting and keeping payments. Consequently, Trustee filed an "ex-parte motion for issuance of garnishee summons after judgment" against several entities including Charter and Spectrum ("Garnishee Motion") in an effort to ensure payments were properly directed to the bankruptcy estate and not SIC.[7] In the Garnishee

---

[7] Specifically, the entities to be garnished were: Time Warner Entertainment Co.

Motion, Trustee explained that he was aware that Charter was making payments to SIC even though pursuant to the Marshal Sale Order, the Paniolo bankruptcy estate was now the owner of SIC's Levied Assets, including SIC's sublease receivables under License No. 372.

The bankruptcy court entered an order granting Trustee's motion on April 8, 2020 ("Garnishee Order").

**E.    The 9019 settlement agreement and master relationship agreement.**

Meanwhile, in the main bankruptcy case, Trustee set his eyes toward the eventual § 363 liquidation sale and anticipated a lack of cooperation from Waimana, SIC, and their affiliates. Consequently, in an effort to avoid future conflict and litigation, Trustee entered into a Rule 9019 settlement agreement to clarify the relationship of all parties to the estate's assets (the "2020 Settlement Agreement"). Trustee intended the 2020 Settlement Agreement to: (1) document the termination of SIC's access to the Paniolo Cable Network except as specifically provided in the 2020 Settlement Agreement (which was a maximum of 2 fiber pairs on the Network); (2) to clarify that the § 363 purchaser would have the exclusive right to use and lease capacity on the Paniolo Cable Network; and (3) to ensure only Trustee or the eventual purchaser could use, and profit from, the Paniolo Cable Network.

---

LP dba Oceanic Time Warner Cable, Time Warner Cable Enterprises LLC, Spectrum Oceanic, LLC, and Charter.

9

The parties to the 2020 Settlement Agreement included Trustee, the Paniolo Creditors, Waimana, and the "SIC Affiliates" (SIC, Clearcom, Pa Makani, and Ho'Opa'a Insurance Corp., all of which Waimana directly or indirectly owned or controlled) (collectively, Waimana and the SIC Affiliates are referred hereafter as the "SIC Parties").

Relevant to this appeal, the 2020 Settlement Agreement included certain acknowledgments including: (1) the SIC Judgment, (2) that historically SIC had subleased access to capacity on the Paniolo Cable Network to other entities in return for lease payments, but SIC no longer had any such authority or permission; (3) that because SIC no longer had any rights to lease access to capacity on the Paniolo Cable Network, all future access would be governed by a "Master Relationship Agreement" (sometimes referred to as the "MRA") to be executed at the same time as the 2020 Settlement Agreement.[8]

The 2020 Settlement Agreement also included specific representations and warranties by the SIC Parties. Specifically, Section 8 required the SIC Parties to represent and warrant that there were not currently, nor would there be in the future, any agreements related to access to capacity on the Paniolo Cable Network to which any of SIC Parties were a party. Section 8 stated:

---

[8] The 2020 Settlement stated that the "Master Relationship Agreement" would be substantially similar to the form attached as Exhibit 1 and would be submitted to the bankruptcy court for approval.

[T]he SIC Parties hereby represent and warrant to the other parties that there **are no agreements of any nature** (including without limitation, grants of Indefeasible Rights of Use (IRUs), wholesale contracts, or commercial agreements) permitting persons or entities other than SIC to use capacity on the **Paniolo Cable System** other than the two pairs of fiber reserved to SIC for the purposes stated herein. (Emphasis added)

The accompanying Master Relationship Agreement: (1) terminated the existing SIC Lease; (2) granted Trustee (or his designee or successors) an indefeasible right of use and complete transfer of all Scheduled A.2 Assets, the ("Schedule A.2 Assets IRU"); (3) granted solely to SIC (and not any of its affiliates) the right of access to a maximum of two fiber pairs on the Paniolo Cable Network; (4) provided that SIC could only use its limited access on the Paniolo Cable Network to provide retail telecommunications services to customers (end-users) on HHL; (5) prohibited SIC from using its access for resellers; (6) prohibited SIC from assigning or leasing any of its access on the Paniolo Cable Network; (7) required the SIC Parties to agree that "any assignment, sublease or use other than to provide retail telecommunications services to SIC end-user customers residing on the Hawaiian Home Lands during the term of the Master Relationship Agreement shall constitute an event of default" and would immediately cancel all SIC's rights to the Paniolo Cable Network.

The 2020 Settlement Agreement stated that its effective date was March 6, 2020 (the same day the bankruptcy court entered the Marshal Sale

11

Order). However, the bankruptcy court did not enter an order approving the 2020 Settlement Agreement until June 4, 2020.

## F.     The § 363 sale order.

After the bankruptcy court approved the 2020 Settlement Agreement, Trustee worked diligently toward the § 363 sale despite the SIC Parties' ongoing resistance and uncooperativeness. On November 30, 2020, Trustee filed a motion seeking in relevant part to sell the estate's property free and clear of liens under § 363(f) to Hawaiian Telecom, Inc. ("Hawaiin Telecom" or "HTI"), to approve the related asset purchase agreement, and to approve the assignment and assumption of certain executory contracts and unexpired leases.

On December 28, 2020, the bankruptcy court entered an order approving the sale to Hawaiian Telecom, "an experienced telecommunications network operator" for a purchase price of $50 million free and clear pursuant to § 363 ("363 Sale Order") and approved the related asset purchase agreement ("APA"). The 363 Sale Order in conjunction with the APA specifically identified the assets Hawaiian Telcom was purchasing from Trustee (the "Transferred Assets").[9] The Transferred Assets included both Paniolo's assets and the assets Trustee acquired from SIC pursuant to the Marshal Sale Order. The purpose of the sale was to transfer all the assets necessary for Hawaiian Telcom to

_____

[9] Excluded from the transferred Assets was the SIC Judgment.

continue the operations of the Paniolo Cable Network for telecommunication operations.

The 363 Sale Order found, among other things, that Hawaiian Telcom was a good-faith purchaser, that any objections or responses to the § 363 Sale were overruled, and that any party who did not object was deemed to have consented under the terms of the Bankruptcy Code. The 363 Sale Order further confirmed that the Transferred Assets were transferred "free and clear of all Interests or Claims . . . that existed prior to the Closing."

The 363 Sale Order also imposed certain obligations on SIC even though SIC was not a party to the 363 Sale Order or the APA. The 363 Sale Order provided that it and the APA were binding on SIC and its affiliates and required anyone in possession of Transferred Assets, including "SIC and SIC's affiliates" to "surrender possession of the Transferred Assets" to Hawaiian Telcom upon closing. The 363 Sale closed on August 31, 2021.

The 363 Sale Order was not appealed.

G.    **The 2021 Adversary Proceeding**

While Hawaiian Telecom was battling the SIC Parties in the main bankruptcy and in state court and federal court,[10] Trustee discovered that Clearcom had continued to lease access on the Paniolo Cable Network to third parties despite having no authority and despite warranting in the

---

[10] See *Sandwich Isles Commc'ns, Inc. v. Hawaiian Telcom, Inc.*, 2023 WL 6378626 (D. Haw. Sept. 29, 2023) for a very lengthy and detailed decision affirming judgment against the SIC Parties in five consolidated appeals.

2020 Settlement Agreement that there were no such agreements. Accordingly, in February 2021, Trustee filed an adversary proceeding against Clearcom (one of the SIC Parties to the 2020 Settlement Agreement) to recoup the payments Clearcom received from Time Warner Entertainment Co. L.P. dba Time Warner Cable, predecessor-by-merger of Time Warner Cable Enterprises LLC and its affiliates ("Charter") for access to the Paniolo Cable Network.

Trustee alleged three counts against Clearcom: breach of contract, unjust enrichment, and turnover. In the first count, Trustee alleged that Clearcom breached the 2020 Settlement by subletting access to capacity on the Paniolo Cable Network to Charter without permission or authority. In the second count, Trustee alleged that Clearcom was unjustly enriched by receiving and retaining payments from Charter for Charter's use of the Paniolo Cable Network. The third count sought turnover of all money Clearcom received. Clearcom denied Trustee's allegations.

### 1.    Trustee's first motion for partial summary judgment.

Trustee moved for partial summary judgment on the issue of liability for counts I and II. In his supporting memorandum, Trustee argued that Clearcom breached the warranties in the 2020 Settlement because it had made at least two agreements with Charter to lease access to the Paniolo Cable Network despite Clearcom having no such authority and in direct conflict of its representations and warranties provided in the 2020 Settlement Agreement.

14

### a.    The October Agreement.

Trustee alleged that Clearcom and Charter entered into an agreement which permitted Charter to use capacity on the Paniolo Cable Network in return for $120,000.00 monthly payments to Clearcom ("October Agreement). In support of his position, Trustee provided copies of October 28, 2019, emails between Tim Davis ("Mr. Davis"), a Charter representative, Mr. Hee, and Wendy Hee ("Mrs. Hee"), president of Clearcom. In the emails, Mr. Davis asked Mrs. Hee about "opportunities to bring up connectivity" to Kauai "quickly on the Paniolo assets" because Charter's "existing connectivity to Kauai [was] down." Four hours later, Mr. Davis added Mr. Hee to the email chain and asked if there were "options on the Paniolo route." Clearcom responded by agreeing to allow Charter to use capacity on the Paniolo Cable Network.

After securing access on the Paniolo Cable Network, Trustee argued that Mr. Davis initiated discussion for future access, asking if the parties could "execute a Service Order for the 8x10G on a month-to-month term."

Trustee alleged that Mr. Davis's request was formalized in a Service Order wherein Charter agreed to pay Clearcom the sum of $120,000.00 per month in return for Charter's use of "8-10G circuits" on the Paniolo Cable Network. Trustee introduced into evidence a copy of the Service Order. Trustee alleged that it was evident on the face of the document that it was an ongoing agreement because the "term" was "30 days," i.e., a month-to-month and it also included a monthly recurring charge ("MRC"). Trustee

15

also introduced an internal Clearcom memo to SIC Accounting, signed by Mrs. Hee summarizing the agreement. Trustee presented a February 2022 invoice billing Charter a monthly charge of $120,000.00.

### b. The 2021 Agreement.

The second agreement Trustee introduced was a November 2021 Internet and Video Service Rights and Data Purchase Agreement between Clearcom and Charter (the "2021 Agreement"). Trustee alleged that the 2021 Agreement was a modification or extension of an earlier "Cable Services Agreement II." The Cable Services Agreement II stated that SIC held the exclusive right to lease the "underground conduit and ducting systems" ("Infrastructure") and that Charter agreed to pay SIC for use of the Infrastructure. Trustee argued that the Infrastructure referred to was the Paniolo Cable Network. Trustee further argued that the 2021 Agreement was a modification of the Cable Services Agreement II, created solely to circumvent the Garnishee Order. Trustee explained that pursuant to the Garnishee Order, Charter's payments to SIC under the Cable Services Agreement II were being garnished since April 2020. According to Trustee, the parties modified the Cable Services Agreement II to circumvent the Garnishee Order by indicating that Clearcom, rather than SIC held the exclusive rights to lease capacity to Charter on the Paniolo Cable Network and therefore, Charter should remit all future payments to Clearcom rather than Trustee pursuant to the Garnishee Order.

16

In support, Trustee introduced a copy of the Cable Services Agreement II and the 2021Agreement. Trustee argued that the agreements were a clear violation of Clearcom's representations and warranties that no such agreements existed, and no such agreements would be entered into by Clearcom. Trustee further noted that the recitals in the 2021 Agreement supported his argument. Trustee directed the bankruptcy court to the paragraph acknowledging that Charter had been paying SIC for the use of the Infrastructure to furnish cable services since 2006. Specifically, the 2021 Agreement stated:

> WHEREAS, pursuant to the Cable Services Agreement II between Sandwich Isles Communications, Inc. ("SIC") and . . . Charter, dated January 1, 2006 . . . Charter has been utilizing "Infrastructure" to furnish "Cable Services" . . . on Hawaiian Home Lands ("HHL") in exchange for the payment of a "Per Unit" access fee to SIC . . . and the Infrastructure Charter has been utilizing to date (including any **underground conduit and ducting systems infrastructure** to include conduits, manholes, handholes, and pull boxes), the "Licensed Infrastructure. . ." (emphasis added).

Trustee next directed the court to the paragraph that acknowledged that since April 2020, the payments were remitted to Trustee rather than SIC pursuant to the bankruptcy court's Garnishee Order. Finally, Trustee directed the bankruptcy court to the paragraph that changed the lessor from SIC to Clearcom (without any explanation other than the Garnishee Order), stating that Clearcom now held the exclusive right to lease the

17

Licensed Infrastructure to Charter, pursuant to License No. 372.

Specifically, the 2021 Agreement stated:

> WHEREAS, ClearCom represents and warrants that (a) pursuant to License Agreement No. 372 . . . ClearCom holds the exclusive rights to . . . use capacity on the Licensed Infrastructure . . . [and] ClearCom holds the exclusive rights and authority to grant to Charter the right to use capacity on the Licensed Infrastructure to provide Data Services on HHL, and (c) SIC holds no rights or authority to grant Charter the right to provide Data Services on the Licensed Infrastructure;

> WHEREAS, Charter and Clearcom seek to document a new, go-forward only arrangement whereby Clearcom grants to Charter the right to use capacity on the Licensed Infrastructure to provide Data Services to customers in the HHL[.]

Trustee argued that although both the Cable Services Agreement II and the 2021 Agreement used the term "Infrastructure" rather than specifying the Paniolo Cable Network, the context clearly demonstrated that the parties were referring to the use of the Paniolo Cable Network. Additionally, Clearcom admitted through discovery that the 2021 Agreement "relat[ed] to, refer[ed] to, the use of, or access to, the Paniolo [Assets]." According to Trustee, "Infrastructure" as used in the agreements and the Paniolo Cable Network were equivalent.

Based on the evidence, Trustee argued that there was no genuine dispute of material fact that Clearcom breached the 2020 Settlement Agreement because it was subletting capacity pursuant to the October Agreement and the 2021 Agreement. Trustee further argued that there was

18

no genuine dispute of material fact that Clearcom accepted payments for subletting estate property without authority and was therefore, unjustly enriched.

Clearcom opposed Trustee's motion for summary judgment. Generally, Clearcom did not dispute that it received payments from Charter or that the payments were for Charter's use of the Paniolo Cable Network. Rather, Clearcom disputed the bankruptcy court's jurisdiction. Clearcom also argued that it was only leasing capacity at the direction of SIC. According to Clearcom, the 2020 Settlement was never breached because "Clearcom's role did not involve granting Charter access to the Paniolo [Assets]." Clearcom also disputed the unjust enrichment claim on the basis that it had eventually remitted all money received from Charter to SIC. Because Clearcom had not retained any funds, Clearcom argued that it could not have been unjustly enriched.

### c. The bankruptcy court's order granting partial summary judgment.

After a hearing, the bankruptcy court granted Trustee's motion for partial summary judgment on liability on counts I and II. The bankruptcy court's oral ruling made three decisions: the bankruptcy court had subject matter jurisdiction and personal jurisdiction over Clearcom; Clearcom breached the 2020 Settlement by allowing Charter to use the Paniolo Assets; and Clearcom was unjustly enriched even if it remitted to SIC all the funds it received from Charter.

19

The bankruptcy court entered a written order consistent with its oral ruling on March 15, 2023 ("First Summary Judgment Order") holding that Clearcom was liable to Trustee "in respect of the claims asserted in Counts I and II of the Complaint." Clearcom filed a motion for leave to appeal, which the BAP denied as interlocutory.

**2.      Trustee's second motion for partial summary judgment.**

Trustee filed a second motion for partial summary judgment on two issues. First, the Trustee asked the court to rule that an additional agreement between Clearcom and Charter, the Master Services Agreement ("MSA"), violated Section 8 of the 2020 Settlement. Second, Trustee asked the court to find that Clearcom was liable for $9,197,554.23 in damages.

Trustee asserted that the MSA was newly discovered and was Clearcom and Charter's overarching agreement concerning the Paniolo Cable Network. The Master Services Agreement permitted Charter to rent telecommunications capacity from Clearcom by submitting written orders called "Access Service Requests" or "ASRs" to Clearcom. An ASR indicated, among other things, the amount of telecommunications capacity (or "circuits") Charter intended to rent from Clearcom and the amount that Charter agreed to pay. Clearcom accepted the ASRs by responding with a "Firm Order Confirmation," or "FOC."

Trustee alleged that he became aware of the MSA through further discovery. Trustee argued that again, even though the MSA did not specifically reference the Paniolo Cable Network, by Clearcom's own

20

admission, the MSA related to the use or access to the Paniolo Cable Network.[11] Trustee argued the MSA was still in operation and offered the deposition testimony of Gregg Fujimoto, Charter's Senior Vice President of Field Operations, as evidence. Mr. Fujimoto testified that the MSA was in effect as of September 2023. He also stated that the October Agreement was part of the MSA. The Trustee offered spreadsheets obtained from Charter, corroborated by Mr. Fujimoto's deposition testimony, showing amounts Charter paid Clearcom under the MSA, the October Agreement, and the 2021 Agreement.

Trustee argued that the estate was entitled to damages in the total amount of $9,197,554.23. Trustee contended that Clearcom received $1,481,314.45 prior to the 2020 Settlement under the MSA and 2019 Agreement. Trustee alleged Clearcom received $6,443,036.78 from Charter after the 2020 Settlement. Trustee claimed $7,924,351.23 total for breach of contract under count I. Trustee asserted $1,273,203 in count II's unjust enrichment claim for money received under the 2021 Agreement.

Despite the bankruptcy court's previous determination of liability, Clearcom continued to deny liability for breaching the 2020 Settlement Agreement. Clearcom continued to argue that it "did not have any capacity

---

[11] Although the bankruptcy court had already determined in its First Summary Judgment Order that Clearcom leased capacity to Charter pursuant to the 2021 Agreement and the October Agreement, in violation of the 2020 Settlement Agreement, Trustee renewed his argument in his second motion for summary judgment based on Clearcom's further discovery responses.

of its own on the Paniolo Network to lease to anyone." According to Clearcom, it merely acted as an intermediary between SIC and Charter: "SIC had apparent authority to use the Paniolo Cable Network, and to permit Clearcom to use that access to assist SIC in fulfilling its obligation to operate and maintain the Paniolo network." Clearcom also renewed its defense that it was not unjustly enriched because it was only a conduit for payments from Charter to SIC. Clearcom admitted it received payments, but argued that it was not unjustly enriched because "all monies paid by Charter to Clearcom in relation to the Paniolo Cable Network were remitted to SIC."

Clearcom also continued to dispute the bankruptcy court's jurisdiction. Clearcom further argued that there were "other agreements between Charter and Clearcom for which Charter pay[ed] Clearcom," and Trustee had not established the payments were for access on the Paniolo Cable Network and not something else. Clearcom did not elaborate on the subject matter of the alleged other agreements or provide copies or other objective, admissible evidence.

Prior to the hearing on the second motion for partial summary judgment, Trustee filed an "Errata to Plaintiff's Second Motion for Partial Summary Judgment" in which he explained to the bankruptcy court that the amount of alleged damages was incorrect due to accidentally counting the sum of $1,481,314.45 twice. Accordingly, he was reducing the total amount of damages sought from $9,197,554.23 to $7,716,239.78. The Trustee

22

revised Count I's breach of contract damages from $7,924,351.23 to $6,443,036.78. Trustee continued to claim $1,273,203 under Count II's unjust enrichment theory. Trustee amended all filings to reduce the total claimed damages from $9,197,554.23 to $7,716,239.78.

The next day, at the hearing on the second motion for partial summary judgment, the bankruptcy court: (1) accepted Trustee's request to drop its third count (turnover) so that the bankruptcy court could enter a final judgment; (2) granted Clearcom a limited continuance and leave to file a sur reply addressing the new damage calculation only; and (3) took the matter under advisement until after Clearcom' sur reply.

Contrary to the court's direction, Clearcom's sur reply did not relate solely to Trustee's reduced damages calculations. Rather, Clearcom reargued previous factual contentions and even attempted to raise new arguments with additional declarations from Mr. Hee and Mrs. Hee. For the first time, Clearcom argued that the MSA expired when Clearcom agreed to the 2020 Settlement, that the October Agreement only lasted one month, and that the 2021 agreement did not involve the Paniolo Assets. Clearcom agreed that the Trustee's damages calculations were wrong, but not because Trustee made a counting error, but rather, because Clearcom did not breach the 2020 Settlement so there were no damages. Clearcom also argued that unjust enrichment was not available because Trustee had pled a claim for breach of the 2020 Settlement.

On January 16, 2024, the bankruptcy court issued a written memorandum granting Trustee's second motion for summary judgment on counts I and II ("Final Summary Judgment Order"). First, the bankruptcy court determined it had both personal jurisdiction and subject matter jurisdiction. Next, it determined that Clearcom breached the 2020 Settlement Agreement. The bankruptcy court determined from the record provided "that (1) Clearcom represented that it did not have, and it agreed that it would not make, any agreements allowing anyone to use the Paniolo Assets, . . . (2) nevertheless Clearcom made agreements with Charter that allowed Charter to use the Paniolo Assets," and (3) Clearcom collected money from Charter under those agreements.

The bankruptcy court rejected Clearcom's attempts to portray itself as merely acting on behalf of its affiliate, SIC. The bankruptcy court also rejected Clearcom's attempts to create a genuine issue of material fact through declarations from members of the Hee family. The bankruptcy court explained that the declarations were "inconsistent with contemporaneous communications between Charter and Clearcom, as well as Clearcom's earlier documents produced under oath" and therefore, "no reasonable jury could accept those declarations and rule in favor of Clearcom."

On April 23, 2024, the bankruptcy court entered a final judgment consistent with its Final Summary Judgment Order, awarding Trustee

damages in the amount of $7,716,239.78 plus interest (together, the "Final Order").

### 3. Clearcom's reconsideration motion.

On May 6, 2024, Clearcom moved for reconsideration. Clearcom based its reconsideration motion almost exclusively on an attached declaration of Norman Santos, a former Charter employee which Clearcom argued was "newly discovered evidence." The Santos declaration essentially generally disputed, without objective support, all the facts and information Trustee introduced through the testimony of Gregg Fujimoto and Charter's financial disclosures. Clearcom alleged that Trustee was aware of Mr. Santos but "did not provide the information to the court or the defendants." Therefore, Clearcom argued it was entitled to relief from the final judgment.

The bankruptcy court disagreed. On May 30, 2024, the bankruptcy court entered an order denying Clearcom's motion for reconsideration ("Reconsideration Order"). The bankruptcy court determined that the declaration did not qualify as newly discovered evidence because he was an employee of Charter since 2000 and "Clearcom could have obtained this declaration before the court granted summary judgment." The bankruptcy court further determined that regardless, even if the declaration had been timely, it would not have changed the result because it was inconsistent with the agreements between Clearcom and Charter, inconsistent with Clearcom's previous discovery responses, and inconsistent with the

25

declaration of Mr. Fujimoto and the financial documents provided by Charter in response to interrogatories and requests for production. Consequently, the bankruptcy court determined that Clearcom had not demonstrated it was entitled to relief and denied its motion for reconsideration.

Clearcom timely appealed both the Final Order and the Reconsideration Order.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court erred in granting summary judgment.

Whether the bankruptcy court abused its discretion in denying Clearcom's motion for reconsideration.

## STANDARDS OF REVIEW

We review de novo the bankruptcy court's decisions to grant summary judgment. *Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 461 (9th Cir. BAP 2015). "De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

We review for abuse of discretion "[r]ulings regarding evidence made in the context of summary judgment . . . ." *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005). We also review for abuse of

26

discretion a bankruptcy court's denial of a motion for reconsideration. *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258 (9th Cir. 2010). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, we consider whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

## DISCUSSION

### A. Summary judgment standards

Civil Rule 56(a), made applicable by Rule 7056, provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Kennedy v. U.S. Citizenship and Immigr. Servs.*, 871 F.Supp.2d 996, 1006 (N.D. Cal. 2012).[12] A dispute over material facts is genuine where a reasonable jury could return a verdict for the nonmoving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has come forward with uncontroverted facts entitling it to relief, the burden shifts to the nonmovant to establish that

---

[12] The standard applied to a motion under Rule 56 seeking "partial summary judgment is identical to the standard for a motion seeking summary judgment of the entire case." *Kennedy*, 871 F.Supp.2d at 1006 (citation omitted).

27

there is a specific and genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986).

In deciding whether material factual issues exist, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the court is required to do so only in circumstances where a fact specifically averred by the moving party is contradicted by specific evidence submitted in opposition to the motion. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). If a motion for summary judgment is properly supported and the nonmovant does not set forth specific facts showing a genuine issue for trial, summary judgment must be entered. Civil Rule 56(a); Rule 7056.

**B.    Application of summary judgment standards**

Clearcon assets error in the bankruptcy court's reliance on extrinsic evidence, determinations regarding credibility, and disregard of Clearcon's evidence in connection with its grant of summary judgment.[13] We disagree. Trustee provided evidence that despite signing the 2020 Settlement Agreement, Clearcom continued to lease capacity on the Paniolo Cable Network in return for payment. While the evidence provided by Trustee was far from a smoking gun, we agree with the bankruptcy court that it was sufficient to establish Clearcom's breach of the 2020 Settlement

---

[13] Clearcom no longer disputes the bankruptcy court's jurisdiction.

Agreement and Clearcom's unjust enrichment. We also agree that Clearcom's general denials and the Hee family's declarations were insufficient to create genuine issues of material fact and summary judgment was appropriate.

### 1. The bankruptcy court did not err in granting Trustee's motion for summary judgment on breach of contract.

To establish a breach of contract claim, a plaintiff must demonstrate: "(1) a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damages to plaintiff." *Haw. State Fed. Credit Union v. Kahapea*, 497 P.3d 1103, No. CAAP-20-0000057, 2021 WL 4949180, at *3 n.7 (Haw. Ct. App. Oct. 25, 2021) (unpublished table decision).

On appeal, Clearcom argues that it established genuine issues of material fact as to the existence of a breach of contract, namely (1) whether the MSA, the October Agreement, and the 2021 Agreement (the "Clearcom-Charter Agreements") terminated before Clearcom signed the 2020 Settlement Agreement, in which case those agreements could not have contributed to a breach; and (2) whether the Clearcom-Charter Agreements related to the use of or access to the Paniolo Cable Network. We disagree.

Trustee provided several pieces of evidence that together sufficiently established the existence, timing, and subject matter of the Clearcom-Charter Agreements. Trustee produced copies of the Clearcom-Charter Agreements. Although only the October Agreement specifically referred to

29

payment for access to capacity on the Paniolo Cable Network (the MSA refers to payment for use of "circuits" and the 2021 Agreement refers to payment for use of "Licensed Infrastructure"), Trustee provided sufficient evidence demonstrating that that the subject matter of all three Clearcom-Charter Agreements was access to capacity on the Paniolo Cable Network.

First, Trustee provided copies of emails creating the October Agreement which provided that Charter would make monthly payments of $120,000 to Clearcom for capacity on the Paniolo Cable Network. In addition to the emails, Trustee provided a copy of an internal Clearcom memo to SIC Accounting, signed by Mrs. Hee summarizing the agreement and stating that "Charter Communications requested emergency use of the Paniolo network to restore services to Kauai," and that "Clearcom utilized its agreement with SIC to provide Charter with the requested capacity" at a charge of "$120,000 (plus tax) per month or annually $1,440,000." Trustee introduced several financial documents provided by Charter through requests for production showing the monthly $120,000 payments.

Second, Trustee provided Clearcom's responses to interrogatories in which Clearcom identified the MSA and the 2021 Agreement as agreements "*relating, or referring to, the use of, or access to, the Paniolo Cable Network.*"

Third, Trustee introduced Clearcom's responses to Trustee's concise statement of undisputed facts which Trustee argued were Clearcom's tacit confirmation that the Clearcom-Charter Agreements existed and related to

capacity on the Paniolo Cable Network. For example, one of Trustee's concise facts stated: "In reality, in October 2019, Clearcom had agreed to allow Time Warner Entertainment Co. L.P. . . . ("Charter") to use capacity on the **Paniolo Cable Network** in return for monthly rental payments of $120,000 (the "October Agreement")." (Emphasis added). Clearcom's response did not dispute the existence of the October Agreement or dispute the fact that it received monthly payments of $120,000 for allowing Charter to use capacity on the Paniolo Cable Network. Rather, Clearcom merely disputed keeping the payments, stating "All moneys paid by Charter to Clearcom were remitted to Sandwich Isles Communications, Inc." Similarly, Clearcom's response to Trustee's statement of fact related to the MSA did not dispute the existence of MSA or dispute Trustee's alleged fact "that the MSA permitted Charter to rent capacity on the Paniolo Cable Network from Clearcom." Rather, Clearcom's response merely disputed that it was the entity providing access (alleging it was SIC) and again stated that "all monies paid by Charter to Clearcom in relation to the Paniolo Cable Network were remitted to [SIC]."

Finally, Trustee presented the deposition testimony of Mr. Fujimoto. Mr. Fujimoto testified as to the Clearcom-Charter Agreements and testified that the MSA was still in effect. Mr. Fujimoto also testified that the financial documents Charter provided pursuant to discovery requests were accurate records of payments made from Charter to Clearcom pursuant to the

31

Clearcom-Charter Agreements.[14]

In reviewing the record, we find that Trustee's evidence, when taken together, satisfies Trustee's initial burden of establishing it was entitled to judgment on the breach of contract claim as a matter of law and no genuine issues of material fact remained.

The burden then shifted to Clearcom to produce competent evidence establishing a genuine issue of fact for trial. *See Celotex Corp,* 477 U.S. at 322 n.3. The nonmovant "may not rely on denials in the pleadings but must produce specific evidence . . . to show that the dispute exists." *Barboza v. New Form, Inc. (In re Barboza),* 545 F.3d 702, 707 (9th Cir. 2008) (citation omitted). Conjecture, surmise or "metaphysical doubt" by the nonmovant of the movant's assertions will not defeat a summary judgment motion. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 586.

Thus, when the burden shifted, Clearcom had both the opportunity and the responsibility to come forward with evidence, facts, and law to demonstrate a triable issue of fact in order to defeat Trustee's summary

---

[14] At oral argument, Trustee's counsel was questioned regarding Mr. Fujimoto's testimony and the accompanying financial records. It appeared from the record that the document that Mr. Fujimoto stated reflected Charter's payments to Clearcom under the 2021 Agreement showed payments prior to its execution in 2021. Trustee's counsel, after conferring and not receiving any objection from opposing counsel, submitted a letter of clarification after oral argument. Trustee's counsel explained that the confusion was caused by "the fact that Exhibit 'D' to Mr. Fujimoto's deposition . . . was labeled as Exhibit 'E' to Plaintiff's Second Motion for Partial Summary Judgment." Counsel confirmed that the record did not show any payments from Clearcom to Charter under the 2021 Agreement before 2021.

judgment motion. Clearcom did not meet its burden. Rather, Clearcom relied on general denials and conclusory, self-serving declarations which were insufficient to create genuine issues of fact.

Clearcom argued that the Clearcom-Charter Agreements were unclear as to the expiration dates and subject matter. However, merely stating this without more was insufficient to establish a genuine dispute of fact and insufficient to overcome Trustee's evidence demonstrating that the Clearcom-Charter Agreements concerned capacity access on the Paniolo Cable Network and that the MSA and the October Agreement were in effect when Clearcom signed the 2020 Settlement Agreement and that Clearcom made the 2021 Agreement after signing the 2020 Settlement Agreement.

Rather than relying on general assertions, Clearcom had to come forward with probative evidence establishing a genuine dispute. Clearcom did not meet its burden. Indeed, Clearcom did not provide any probative evidence beyond declarations by Albert Hee and Wendy Hee, which lacked specificity, lacked supporting evidence, and as the bankruptcy court noted, were inconsistent with contemporaneous documents and prior admissions by Clearcom. *See FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

The bankruptcy court reasoned that Clearcom's attempt to negate its

33

responsibility did not make sense and did not create a genuine issue of fact. "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996) (citation omitted). The bankruptcy court determined that beyond Mr. Hee's declaration, such assertions were not supported by any objective evidence. Furthermore, the bankruptcy court reasoned that Clearcom's assertion that it was merely acting as a conduit was not believable. Based on the admissible objective evidence, the bankruptcy court determined that:

> even if Clearcom did not have the legal right to grant access over the Paniolo [Cable] Network, it made a representation in the [2020] settlement agreement that it had no such agreement and that representation was false because Clearcom had signed an agreement with Charter that allowed use of the so-called license infrastructure, which had to include the undersea system operated by Paniolo, . . . . So that representation was false. Even if Clearcom didn't have the legal right to grant that access, it made an agreement that said it would.

The bankruptcy court's reasoning was not erroneous. Based on our independent review of the record, the bankruptcy court did not commit error in determining that the evidence provided by Clearcom was insufficient to create a genuine dispute of fact.[15] Further, the bankruptcy

---

[15] Clearcom was asked at oral argument to detail what evidence it provided to the bankruptcy court that created a genuine dispute that the subject matter of the Clearcom-Charter Agreements was something other than the Paniolo Cable Network (because in its appellate briefing, Clearcom made broad statements that it had provided

34

court did not commit error in determining that "Clearcom [was] liable for breaching the 2020 Settlement because of its participation in the MSA, the [October] Agreement, and the 2021 Agreement," and granting Trustee's motion for summary judgment on his breach of contract claim.

## 2. The bankruptcy court did not commit error in granting Trustee's motion for unjust enrichment.

The Hawai'i Supreme Court has recognized that "unjust enrichment" is a "broad and imprecise term defying definition." *Small v. Badenhop*, 701 P.2d 647, 654 (Haw. 1985). In deciding whether there should be restitution in a certain circumstance, the Hawai'i Supreme Court directed courts to be guided by the underlying concept of restitution and the prevention of injustice. *Id.*; *Durette v. Aloha Plastic Recycling, Inc.*, 100 P.3d 60, 64 (Haw. 2004), *as corrected*, (Nov. 1, 2004).

"[A] claim for unjust enrichment may be stated by allegations that a third party has conferred a benefit upon a defendant to which the plaintiff claims he or she has a superior legal or equitable right." *Lumford v. Yoshio Ota*, 434 P.3d 1215, 1222 (Haw. Ct. App. 2018)

On appeal, Clearcom sets forth only a cursory argument against the

---

extensive contradictory evidence that the bankruptcy court ignored). Clearcom admitted that it had not provided any evidence other than the Hee declarations. Clearcom argued this was the very reason why a trial was necessary, to allow it to potentially introduce opposing evidence. Clearcom misunderstands the summary judgment process. The time to come forward with opposing, probative evidence was in its opposition to Trustee's motion for summary judgment, not to wait for a trial that will never happen because it did not meet its burden to go forward.

bankruptcy court's determination that it was unjustly enriched. Importantly, Clearcom does not dispute the amount awarded by the bankruptcy court. Rather, Clearcom argues that "Trustee failed to establish that the amounts Charter paid Clearcom were paid in exchange for access to infrastructure that the Trustee, 'and not Clearcom' owned." Op. Br. 38.

As noted in the previous section Trustee presented evidence of the existence of the Clearcom-Charter Agreements, evidence that the subject matter of the Agreements was capacity access on the Paniolo Cable Network, and evidence that Clearcom accepted payments from Charter under the Agreements for capacity on the Paniolo Cable Network.

The burden then shifted to Clearcom to provide probative evidence demonstrating a genuine dispute that the payments were for something other than subletting capacity on the Paniolo Cable Network to Charter without permission or authority. Although Clearcom alleged that it had other contracts that would explain the payments, Clearcom did not identify or provide copies of any of the alleged other contracts. Conclusory allegations and unreasonable inferences are insufficient to create a genuine issue of material fact. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997), *as amended* (Apr. 11, 1997). Indeed, "[t]he mere existence of a scintilla of evidence . . . [is] insufficient; there must be evidence on which the jury could reasonably find for [Clearcom]." *Anderson*, 477 U.S. at 252. Clearcom failed to establish a genuine dispute of material fact regarding the purpose of the payments.

36

Consequently, the bankruptcy court did not err in determining that it "would be unjust to allow Clearcom to retain payments it received for the use of assets that the Trustee, and not Clearcom, owned" and granting Trustee's motion for summary judgment.

## C. The bankruptcy court did not abuse its discretion in denying Clearcom's motion for reconsideration.

The bankruptcy court did not abuse its discretion by denying Clearcom's motion for relief from the final judgment pursuant to Civil Rule 60(b), made applicable by Rule 9024, because Clearcom failed to demonstrate grounds for such relief. *Blixseth v. Glasser (In re Yellowstone Mountain Club, LLC)*, 593 F. App'x 643, 644 (9th Cir. 2015) ("Bankruptcy Rule 9024 says that Federal Rule of Civil Procedure 60 applies to bankruptcy proceedings."). Relief from judgment on the basis of newly discovered evidence is warranted if (1) the moving party can show the evidence relied on in fact constitutes "newly discovered evidence" within the meaning of Rule 60(b); (2) the moving party exercised due diligence to discover this evidence; and (3) the newly discovered evidence must be of "such magnitude that production of it earlier would have been likely to change the disposition of the case." *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A., Inc.*, 833 F.2d 208, 211 (9th Cir. 1987). "Evidence is not 'newly discovered' under the Federal Rules if it was in the moving party's possession at the time of trial or could have been discovered with reasonable diligence." *Id.* at 212.

Clearcom sought relief based on "newly discovered evidence" in the form of a declaration signed on April 1, 2024 by Norman P. Santos, a former Vice President of Network Operations for Charter.

Here, the bankruptcy court ruled that Clearcom had not established cause for relief under Civil Rule 60(b)(2). The bankruptcy court determined that Clearcom failed to establish why, with reasonable diligence, the declaration could not have been timely obtained and presented before the court ruled on Trustee's motion for summary judgment. The bankruptcy court reasoned that regardless of Clearcom's label, the declaration did not qualify as newly discovered evidence because Mr. Santos was known to Clearcom since 2000 and "helped negotiate the contracts at issue between Clearcom and Charter." The bankruptcy court further determined that regardless of the timing, the declaration failed to establish a genuine issue of dispute because it was "inconsistent with the agreements between Clearcom and Charter, Clearcom's previous responses under oath, and a declaration by a current Charter employee." On this record, we cannot say that the bankruptcy court's ruling was clearly erroneous; instead, it was logical, plausible and supported by the record. *See Hinkson*, 585 F.3d at 1262.

## CONCLUSION

Based on the foregoing, we AFFIRM.